MICHAEL BASSIRI (SBN:191808)
bassiri@afflictionclothing.com
1799 Apollo Court
Seal Beach, California 90740
Telephone:  (562) 598-0299
Facsimile:   (562) 598-3824

Attorneys for Defendants Affliction Entertainment Group, LLC erroneously sued herein as Affliction Clothing and Affliction Entertainment, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDOR EMELIANENKO, an individual; M-1 NEDERLAND b.v., a Dutch limited liability company,<br><br>　　Plaintiffs,<br><br>vs.<br><br>AFFLICTION CLOTHING, a California business entity, form unknown; AFFLICTION ENTERTAINMENT, LLC, a California limited liability company, and DOES 1 through 50, inclusive,<br><br>　　Defendants, | Case No.: CV09-07865 MMM (MLGx)<br><br>**DECLARATION OF MICHAEL BASSIRI IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date: January 25, 2010<br>Time: 10:00 a.m.<br>Courtroom: 780<br>Judge: Margaret M. Morrow |

1  I, Michael Bassiri, declare as follows:

2  1. I am an attorney for Affliction Entertainment Group, LLC, erroneously sued herein as Affliction Clothing and Affliction Entertainment, LLC. I have personal knowledge of the matters set forth in this declaration and if called upon to do so, could competently testify thereto.

6  2. Affliction Promotions, Inc., after executing the agreements with Fedor Emelinenko and M-1 Nederland b.v. respectively on April 18, 2008 and April 14, 2008, was converted-out to Affliction Promotions, LLC on May 16, 2008. Affliction Promotions, LLC thereafter changed its name to Affliction Entertainment, LLC on May 30, 2008. Thereafter, Affliction Entertainment, LLC assigned all rights and duties under the Fight Agreement and the Consulting Agreement to Affliction Entertainment Group, LLC, a California limited liability company in July 2008. This entity staged and promoted the two fights referenced in Plaintiffs' complaint in which Mr. Emelianenko participated.

15  3. Attached hereto as Exhibit "1" is a true and correct copy of the Fight Agreement between Fedor Emelianenko and Affliction Promotions, Inc. dated April 14, 2008 and executed on April 18, 2008.

18  4. Attached hereto as Exhibit "2" is a true and correct copy of the Consulting Agreement between M-1 Nederland b.v. and Affliction Promotions, Inc. dated April 14, 2008.

21  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

24  Executed November 6, 2009 at Seal Beach, California.

_____/s/ Michael Bassiri_____
MICHAEL BASSIRI

2
DECLARATION OF MICHAEL BASSIRI

# EXHIBIT 1

# FIGHT AGREEMENT

This agreement ("Agreement"), dated as of April 14, 2008, is entered into by and between Affliction Promotions, Inc. ("AP") and FEDOR EMELIANENKO ("Fighter") relating to Fighter's grant to AP of exclusive promotional rights, as more specifically set forth below. AP and Fighter shall at times be referred to as the "Parties."

1. <u>Term</u>. Commencing upon Fighter's execution of this Agreement and continuing until the earlier of: (i) March 31, 2009; or (ii) conclusion of the last Bout (as more specifically defined below) in which Fighter is obligated to participate which is a minimum of three (3) Bouts, unless the term of the promotion agreement or any extension thereto is terminated sooner or extended further pursuant to this Agreement or pursuant to a separate writing executed by AP and agreed to by Fighter. AP acknowledges and agrees that Fighter is currently scheduled to participate in a match on or around December 31, 2008 in Japan. As a result, AP agrees to schedule all Bouts no less than 60 days prior to the Japan Event to allow for Fighter to prepare and compete in the Japan Bout. Furthermore, in the event that the Couture Bout (as defined below) takes place during the Term, the parties agree that the Term shall be extended for four (4) additional consecutive months.

2. <u>Initial match</u>. The initial Bout pursuant to this Agreement is scheduled for July 19, 2008 in Dallas, TX at the American Airlines arena (the "Initial Bout"). The Initial Bout shall be broadcast on Pay-Per-View.

3. <u>Purse</u>. The Purse shall be Three Hundred Thousand Dollars ($300,000) for each Bout hereunder. The purse shall be due immediately following each Bout and sent via wire transfer as per instruction which shall be provided to AP. In the event the purse is paid by the appropriate governing or regulatory body, such shall be paid pursuant to its disbursement guidelines.

4. INTENTIONALLY DELETED.

5. <u>Travel/Accommodations</u>. For each Bout hereunder, AP shall arrange, pay for and provide Fighter (for use by Fighter and his representatives and cornermen) with: (a) four (4) first class and three coach class round-trip airfares from the major airport nearest Fighter's training camp (currently St. Petersburg Russia) to the major airport nearest the site of the Bout; (b) four first class hotel rooms (three single rooms and one double room) for up to five nights; (c) meals or per diems for five persons for up to five days; and (d) round trip exclusive ground transportation (no less than town car) for all individuals mentioned herein, including airport transfers..

6. <u>Rights</u>. Fighter agrees that during the Term, AP shall be the sole and exclusive co-promoter (with Fighter or Fighter's reasonable designee) of all mixed martial arts or unarmed combatant (collectively, "MMA") contests in which Fighter fights in the United States (the "Bouts" and each, a "Bout") and, subject to Paragraphs 7 and 11 below, AP shall have all exclusive worldwide Promotional Rights (the "Promotional Rights".) in and to the Bouts. The Promotional Rights shall more specifically include, but are not limited to:

Page 1 of 7

Ex. 1, pg. 3

(a) The right to use, edit, disseminate, display, reproduce, print and/or publish in any media the Identity of Fighter for the purpose of advertising promotion, and publicity, of the Bouts and any activities pertaining to the Bouts; and

(b) Subject to any rights retained by Fighter, all intellectual property rights, title and interest in and to any recordings of the television, radio and Internet broadcasts and motion picture films and video and audio cassettes of, or based upon the AP brand, the Bouts, or activities pertaining to the Bouts, and the right to secure in AP's name copyright and other protection domestically and worldwide, at AP's discretion, to the fullest extent available by law;

(c) Following the expiration or termination of the Term, AP may use Fighter's name and likeness in any and all derivative works created from the Promotional Rights granted to AP in perpetuity herein or a collection of commemorative or similar products or merchandise reflecting collectively on AP champions, and/or fighters only in a historical sense.

7. <u>Exclusivity</u>. Fighter agrees that during the Term: (a) Fighter shall not engage in any MMA match in the United States other than Bouts co-promoted by AP hereunder; and (b) neither Fighter nor anyone acting on Fighter's behalf shall negotiate for nor contract for Fighter to engage in any MMA contest in the United States other than Bouts co-promoted by AP hereunder. AP shall be the exclusive owner of all rights in and to those Bouts promoted by AP in all media throughout the world in perpetuity, subject to Paragraph 11 below. Notwithstanding anything to the contrary contained in this Section 7, the Rights granted herein shall be non-exclusive as it relates to Bouts outside of the United States. Additionally, any MMA contest between Fighter and Randy Couture (the "Couture Bout") shall be excluded from this Agreement and Fighter shall be free to participate in such Couture Bout anywhere worldwide and Fighter shall be entitled to exploit such Couture Bout in any and all media worldwide. Furthermore, the rights granted hereunder do NOT include any right to solicit and/or secure sponsorship, licensing and/or appearance and endorsement opportunities on behalf of Fighter and Fighter may be free, without any restrictions whatsoever, to secure the services of a third party to provide such representation services. Furthermore, Fighter shall be entitled to utilize footage from all Bouts, and license such footage to third party, in promotion of Fighter, subject to any restrictions or limitations imposed by, or pursuant to the terms of contract for broadcast of such footage, broadcast entities such as, but not limited to, television, satellite television, radio, satellite radio, cable, pay-per-view channels, etc. Moreover, nothing in this Agreement shall prevent Fighter from entering into an agreement to participate in a reality-based television series or program (the "Reality Program") to be televised anywhere throughout the world, and AP shall have no rights with respect to such Reality Program, unless agreed otherwise in writing by the parties.

8. <u>Bout Arrangements</u>. During the Term, AP shall use commercially reasonable best efforts to arrange Bouts for Fighter and shall use good faith efforts to provide Fighter with an opponent for each Bout. The opponent for each Bout hereunder shall be selected by AP, subject to Fighter's approval (which approval shall not be unreasonably withheld.) In the event Fighter does not deliver written notice of disapproval within ten (10) business days after AP's notice of the date and opponent, then Fighter shall be deemed to have approved such opponent and date. AP shall select at its discretion, the site for each Bout hereunder.

9. **Additional Acts.** Fighter agrees to perform additional acts, make such appearances (before any applicable athletic commission ("Commission") or otherwise), and to execute and deliver such documents and instruments, as AP may reasonably deem necessary to guarantee the legal effectiveness of and otherwise effectuate the terms of this Agreement. In the event Fighter is required to travel in connection with such additional acts or appearances, AP shall arrange, pay for and provide Fighter and one (1) companion or business associate with all first class expenses (airfare, hotel, ground transportation) in connection therewith. For each Bout, Fighter shall execute and comply with the terms of AP's customary Bout Agreement which shall contain all details pertinent to Fighter's participation in such Bout (i.e. number of rounds, weight classes, combat rules, requirements of Fighter, etc.), including the stipulation that all Bouts shall take place in a ring, which shall be negotiated and approved in advance by Fighter or the bout contract required by the Commission and shall cooperate as required by AP to comply with any applicable law or regulation. Fighter agrees to comply with all rules and regulations of the applicable sanctioning body or bodies and all applicable governmental, legal or regulatory authorities. Prior to any Bout, Fighter shall maintain any and all licenses and clearances, and shall satisfy all other eligibility requirements, necessary to participate as an unarmed combatant in MMA bouts.

10. **Fighter's Sponsors/Partners.** AP shall include Fighter's sponsors and partners in promotional activities during any Bout, provided that inclusion of Fighter's sponsor's and partners does not present a conflict with sponsors and partner's of AP, sponsor's and partners of the Bout, or any broadcast entity. Subject to the foregoing possible limitations, AP will use in commercially reasonable best effort to display the M-1 Global logo on the mat. However, if AP is unable to display such logo on the mat, it agrees that the M-1 Global logo shall be displayed in a location as agreed by Fighter where it shall receive prominent television exposure during the broadcast of the Events (as defined below).

11. **Reserved Rights.** AP grants Fighter the exclusive right to distribute and exploit the Bouts, including the right to stream a live webcast of each Bout (so long as such streaming is geo-blocked in Russia and Asia), as well as any undercards, pre-fights, etc. related to the Bout (together with the Bouts shall be defined as the "Events"), in the territories of Russia and "Asia" (as defined below) (the "Reserved Rights") and the right to exclusively retain any and all revenues derived from its sale, license or other exploitation of the Reserved Rights. (As used above, "Asia" shall be defined as China, Hong Kong, India, Indonesia, Japan, Malaysia, Philippines, Singapore, South Korea, Taiwan and Thailand.) Fighter shall be solely responsible for payment of any and all costs relating to making the Reserved Rights available to Fighter or its licensees (e.g., additional telephone lines at the Bout venue, etc.), as well as any and all equipment, transmissions and other expenses relating to the broadcast and webcast of the Bout in Russia and Asia and the exercise of any other rights granted to Fighter hereunder (collectively, the "Reserved Rights Expenses"). AP shall provide Fighter, at his sole cost and expense, with a high-definition, or if not available, a standard definition television feed of each Bout at customary international world feed standards either via US satellite (if utilized by another international broadcaster) or on-site at or in the television compound, in which case AP shall provide adequate space and power to Fighter and his representatives. Furthermore, AP warrants and represents that any rights cleared by AP for the telecast of the Bouts which are cleared for United States television shall also be cleared for international distribution at AP's sole cost and

expense and Fighter shall have the right to use any English commentary contained therein in Asia and Russia in its sole discretion. AP shall have no responsibility for payment of the Reserved Rights Expenses. To the extent that any such of the Reserved Rights Expenses are charged to, or paid by AP, Fighter shall promptly pay such costs or, at AP's election, reimburse AP upon AP's request therefor upon AP providing Fighter with an invoice together with details of such costs. In the event Fighter desires a television network ("Network") to record each Bout and to deliver the live footage of each Bout by way of satellite uplink and subject to any limitations set forth in this Agreement for dissemination of such Bout footage, Fighter shall be solely responsible for making all such production and technical arrangements, including, without limitation, making contact with the Network and coordinating with the "Network" regarding the Reserved Rights feed and all matters relating thereto, provided that such feed will not conflict with broadcast contracts for the Bout. With the exception of the Couture Bout and the Japan Bout, Fighter shall not: (i) advertise or publicize any telecasts or other exploitation of the Bouts outside of Russia and Asia. All rights in and to the Bout not expressly granted to Fighter in this Paragraph 6 shall be retained by AP.

12. **Publicity/Sponsorship.** Fighter agrees to fully cooperate with and assist in the advertising, publicity and promotion of each Bout as reasonably requested by AP for no additional compensation, including appearing at all required press conferences, interviews and other promotional appearances, provided that no such activities will unreasonably interfere with Fighter's training schedule. Notwithstanding the foregoing, AP shall arrange, pay for and provide Fighter with all first class expenses (air, hotel, ground) in connection with the publicity and promotion of each Bout. No advertising or promotional material appearing on Fighter's body or on any item of clothing worn by Fighter, his trainers, seconds or assistants during and/or at any Bout or any related event shall conflict with any sponsor of the Event or the site; shall display the name, logo or identification of any hotel, casino or gaming, wagering, betting or line service, or any other entity involved with gaming, wagering or betting lines; be in the form of a body or other temporary tattoo or artwork; or be lewd, obscene or otherwise inappropriate (as determined by AP and/or the Network in its reasonable discretion and except to the extent such is pre-existing as of the date of this Agreement for display to the intended live and/or television audience(s).

13. **Taxes.** Fighter shall be solely responsible for payment of any and all taxes relating to amounts payable to Fighter hereunder. AP shall deduct from any payment made to Fighter hereunder all amounts required by federal, state and/or local taxing authorities to be withheld or collected by AP, as well as any other tax or payment made or to be made by AP, or imposed upon or to be imposed upon AP, in connection with amounts payable to Fighter hereunder.

14. **Cancellation/Postponement.** In the event that: (a) Fighter fails or is unable to perform any obligation hereunder due to any illness, injury or disability; due to an order of the Commission or other legal or regulatory entity; or as a result of any breach or non-performance hereunder; or (b) any Bout scheduled under this Agreement is postponed for any reason provided in the immediately preceding clause (a) or in the applicable Bout Agreement, or due to an event of force majeure, disaster, labor action or other reason beyond AP's reasonable control, then without prejudice to any other remedies, AP shall have the right to extend the Term for the

period of such disability, suspension, breach/non-performance or postponement. In the event such extension continues beyond one hundred eighty (180) days, either party shall have the right to terminate this Agreement upon providing written notice to the other. AP shall have the right to terminate this Agreement if: (a) Fighter fails to engage in any Bout hereunder; (b) Fighter engages in any activity or conduct which is illegal, which violates any applicable law or Commission or other governmental, regulatory or sanctioning body rule or regulation, or which subjects Fighter or AP to public ridicule, scorn, contempt or embarrassment; or (c) Fighter is in breach of any of the terms of this Agreement. Conversely, Fighter shall have the right to terminate this Agreement if: (a) AP fails to arrange a Bout within thirty (30) days of execution of this Agreement; (b) AP engages in any activity or conduct which is illegal, which violates any applicable law or Commission or other governmental, regulatory or sanctioning body rule or regulation, or which subjects Fighter or AP to public ridicule, scorn, contempt or embarrassment; or (c) AP is in breach of the terms of this Agreement.

15. <u>Termination Right</u>. In the event that AP shall fail, for any reason other then injury or the physical disability of Fighter or a Bout opponent, to provide the minimum number of Bouts or fails to actively and in good faith pursue opponents for Fighter, Fighter shall have the right to terminate this Agreement. However, good faith shall apply to all aspects of this Agreement, and as such, if AP's failure to provide a minimum number of Bouts is due to the fact that Fighter refused to engage in any specific and /or reasonable Bouts proposed by AP, Fighter's right to terminate this Agreement shall be eliminated.

16. <u>Representations</u>. Each of the parties represents and warrants that: it has the sole right and authority to enter into and fully perform this Agreement and to grant all of the rights granted AP hereunder (and that doing so will not constitute a breach of any agreement with any third party); Neither AP nor Fighter is subject to any contracts, obligations or other commitments which would conflict or interfere with AP rights hereunder; and that there are no claims, disputes or litigation pending or threatened with respect to each's promotional rights. AP shall obtain and maintain, at no cost to Fighter in connection with the Bouts, from a reputable carrier a comprehensive general liability policy in the amounts of $2,000,000 per occurrence/$3,000,000 in the aggregate (the "Policy"). Such policy (including, without, limitation, their terms, limits and deductibles) shall: (i) be subject to Fighter's prior written approval; (ii) be in force for a minimum period of time equal to the Term; (iii) include a provision requiring the insurance company to give Fighter written notice at least 30 days before any revision, modification or cancellation thereof; (iv) name Fighter as additional insured; and (viii) shall be primary and contributing with any similar insurance in effect in the name of or for the benefit of Fighter. Certificates evidencing such coverage shall be delivered to Fighter promptly upon request therefore. Notwithstanding the foregoing, the Policy will include an exclusion denying coverage, in the event a claim is made as a result of Fighter's actions beyond the scope of the acts required of Fighter pursuant to the terms of this Agreement.

17. <u>Death or Disability</u>. This Agreement shall terminate automatically on the death of Fighter. In the event Fighter suffers any mental or physical disability which prohibits Fighter's ability to render services hereunder for a period of eighteen (18) consecutive months, AP may suspend the Term hereunder (including AP's obligation to pay Fighter under the terms hereof) during the continuation of such disability and until Fighter is ready, able and willing to

commence or resume services hereunder. AP may, but shall not be obligated to, extend the term of this Agreement for a period equal to all or any part of the period or aggregate periods of such suspension, but no suspension shall operate to extend the term unless AP so specifies in writing to Fighter.

18. <u>First Negotiation/First Refusal</u>.   Upon expiration, the parties will negotiate exclusively in good faith for a period of at least 30 days regarding a new promotional agreement between Fighter and AP. In the event AP and Fighter fail to reach an agreement within such 30-day period, AP shall present Fighter with their final offer (the "Offer"), which Contractor shall have ten (10) business days to accept or reject. In the event Fighter rejects the Offer, Fighter shall be free to negotiate and enter into agreements with any third party.

19. <u>Governing Law</u>.   This Agreement has been delivered at and will be deemed to have been made at Los Angeles County, California and will be governed and construed in accordance with the laws of the State of California without regard to any conflicts of laws principles. All parties hereto submit to the exclusive jurisdiction of the federal and state courts sitting in the County of Los Angeles with respect to any dispute resulting from this Agreement. Fighter shall defend, indemnify and hold harmless AP and AP's shareholders, officers, representatives and affiliates from and against any and all claims, damages, judgments and expenses (including, without limitation, reasonable legal fees and expenses) as a result of any third party claim or cause of action arising out of any breach (or with respect to third party claims, alleged breach) of this Agreement or Fighter's representations, warranties and obligations hereunder. Fighter's indemnification obligations shall survive the termination of this Agreement. AP shall defend, indemnify and hold harmless Fighter and his heirs, officers, representatives and affiliates from and against any and all claims, damages, judgments and expenses (including, without limitation, reasonable legal fees and expenses) as a result of any third party claim or cause of action arising out of any breach (or with respect to third party claims, alleged breach) of this Agreement or AP's representations, warranties and obligations hereunder or otherwise arising out of AP's promotion of Fighter. AP's indemnification obligations shall survive the termination of this Agreement. Nothing contained in this Agreement shall be construed so as to require the violation of any law or regulation, and wherever there is any conflict between any provision of this Agreement and any law or regulation, the relevant provision so affected shall be limited only to the extent necessary to permit compliance with the minimum legal requirement, and no other provisions of this Agreement shall be affected.

20. <u>Formal Agreement</u>.   AP and Fighter may enter into a more formal agreement incorporating the terms hereof, but until such more formal agreement is executed, this Agreement and its terms and conditions (which are incorporated herein by this reference) shall constitute the entire understanding of the parties hereto, shall supersede any and all prior or contemporaneous written or oral understandings with regard to the subject matters hereof, and shall constitute a legal and binding agreement between the parties. This Agreement may be modified only pursuant to a written document signed by the parties hereto. The terms of this Agreement shall remain confidential and shall not be disclosed by Fighter or Fighter's representatives or AP without the written consent of the other (except to the extent necessary to comply with tax or legal requirements, corporate reporting or as otherwise required by any applicable statute, law or regulation).

By its signature below, each party confirms its understanding of and agreement to the above.

FEDOR EMELIANENKO

By: _____

Name: _Fedor Emelyanenko_

Date: _____


AFFLICTION PROMOTIONS, INC.

By: _____

Name: _Tom Atencio_

Title: _Vice President_

Date: _4/18/08_

# EXHIBIT 2

## CONSULTING AGREEMENT

This Agreement is made this 14th day of April, 2008 (the "Execution Date") by and between Affliction Promotions, Inc. ("AP") and M-1 Nederland b.v., a limited liability company under the laws of the Netherlands ("M-1") relating to certain promotional and consulting related services, as more specifically set forth below. AP and M-1 are at times referred to as the "Parties".

Whereas, AP is the promoter of certain mixed martial arts or unarmed combatant ("MMA") contests in the United States (the "Bouts");

Whereas, the AP and Fedor Emelianenko ("Fedor") have entered into that separate Agreement dated April 14, 2008 (the "Fedor Agreement"), attached hereto as Exhibit A with respect to Fedor's agreement to participate in a minimum of three (3) Bouts (each, a "Fedor Bout"; collectively, the "Fedor Bouts");

Whereas, AP wishes that M-1 provide certain herein defined promotional and consulting-related services in connection with the Bouts and the development of MMA around the world;

Whereas, M-1 desires to provide certain promotional and consulting services to AP in connection with the Bouts and the development of MMA around the world;

Whereas, those defined terms not specifically defined herein shall have those meanings ascribed to them in the Fedor Agreement.

Now, therefore, the parties hereby agree as follows.

1. Term    Commencing upon M-1's execution of this Agreement and continuing until the earlier of: (i) March 31, 2009; or (ii) conclusion of the final Fedor Bout which is a minimum of three (3) Bouts, unless the term of this Agreement is terminated sooner or extended further pursuant to this Agreement or pursuant to a separate writing executed by AP and agreed to by M-1.

2. M-1's Services ("Services").

    a. M-1 shall provide general consulting services to AP in connection with the Fedor Agreement and AP's overall footprint globally, including, but not limited to, consulting services in the following areas (the "Consulting Services"):

        (i)    International (ex US)

        (ii)   International (ex US) Bout-Consulting;

        (iii)  International (ex US) television;

        (iv)   Fighter scouting;

        (v)    Location scouting for future Bouts recommendations;

        (vi)   Television-related opportunities;

        (vii)  International (ex US) sponsorships;

Affliction Promotions
April 8, 2008
Page 2 of 6

        (viii)    Bout tourism (i.e. assisting in sending fans to the US to attend Events).

    b.    In addition to the Consulting Services, and as set forth in the Fight Agreement, M-1 shall fully cooperate with and assist in the advertising, publicity and promotion of each Bout as reasonably requested by AP for no additional compensation except as set forth herein, including appearing at all required press conferences, interviews and other promotional appearances, provided that no such activities will unreasonably interfere with M-1's training schedule.

3.    <u>Compensation.</u>  For its undertakings and efforts hereunder, AP agrees to compensate M-1 as follows:

    a.    As compensation for the Consulting Services, AP shall pay M-1 a consulting fee in the amount of One Million Two Hundred Thousand U.S. Dollars (USD$1,200,000) for each of the Fedor Bouts, for a cumulative fee of Three Million Six Hundred Thousand U.S. Dollars ($3,600,000) (the "Consulting Fee"), as well as reimbursement of expenses as set forth in Section 5 below. The Consulting Fee shall be due according to the following schedule:

- USD$500,000 shall be due immediately upon execution of this Agreement;
- USD$700,000 shall be due no later than forty eight hours (48) prior to the initial Fedor Bout and contingent upon arrival of Fedor to the city of the then scheduled Bout;
- USD$1,200,000 shall be due no later than forty eight hours (48) prior to each of the second (2nd) and third (3rd) Fedor Bouts and contingent upon arrival of Fedor to the city of the then scheduled Bout;

    b.    All payments herein shall be made payable to "M-1 Nederland b.v." and sent via wire transfer as per the following instructions:

        Bank: ING Bank Amsterdam
        Account #: 020149182
        BIC: INGBNL2A
        IBAN NL36 INGB 0020 1491 82

    c.    In addition to the Consulting Fee, AP shall, at its sole discretion, provide M-1 with promotional value using commercially reasonable efforts, within its existing or to-be-created promotional activities to assist M-1 in building and promoting the "M-1 Global" brand activities may include but are not limited to, activities such as:

        (i)    Articles in Event programs;

        (ii)    M-1 Global Logo incorporated in to AP trade advertising as appropriate;

        (iii)    M-1 logo recognition within Event advertising

       (iv)    Public address announcements during the Bouts

       (v)    Promote M-1 events through video announcements at Events;

       (vi)    Create and sell event posters co-branded with M-1 and AP logos.

To this end, AP and M-1 agree to meet within 30 days from the execution of this Agreement in order to outline the specific promotional activities to be undertaken by AP and M-1 to build the "M-1 and/or M-1 Global" brand.

    d. M-1 acknowledges that it is solely responsible for any and all taxes arising from the payments made herein.

4. **Costs and Expenses.** AP shall be responsible for all costs and expenses in connection with this Agreement. In this regard, AP shall arrange, pay for and provide M-1 with any and all expenses incurred in the performance of its duties under this Agreement..

5. **Relationship of the Parties.** AP and M-1 shall be deemed to be independent contractors hereunder and shall not be considered or permitted to be an agent, servant, joint venturer or partner of each other. Accordingly, no taxes shall be withheld from any of the compensation paid to M-1 herein.

6. **Representations and Warranties.** Each of the parties represents and warrants that: it has the sole right and authority to enter into and fully perform this Agreement and to grant all of the rights granted AP hereunder (and that doing so will not constitute a breach of any agreement with any third party); Neither AP nor M-1 is subject to any contracts, obligations or other commitments which would conflict or interfere with AP rights hereunder; and that there are no claims, disputes or litigation pending or threatened with respect to each's promotional rights.

7. **Force Majeure** . In the event the performance of either party hereunder is hindered or prevented, in whole or in part, because of an act of God, inevitable accident, fire, labor dispute, riot or civil commotion, act of public enemy, war or terror, epidemic, governmental act, regulation or rule, or any other reason beyond the control of the parties, neither party shall be liable to the other for any loss, expense or damage incurred by reason of such hindrance or prevention, provided that the non-performing party notifies the other party as soon as possible of the hindrance or prevention. In no event shall any Force Majeure condition excuse AP's obligation pursuant to Section 4 above.

8. **No Assignment.** Unless specifically stated herein, this Agreement and the rights and obligations hereunder may not be sold, assigned or otherwise transferred, directly or indirectly, by operation of law or by sale of ownership interests.

9. **Indemnification**

    a. M-1 agrees to indemnify, defend and hold harmless AP, its partners, officers, agents, representatives and employees from and against any and all demands, claims, damage,

Affliction Promotions
April 8, 2008
Page 4 of 6

liability, injury, loss or expense of any nature and kind, including reasonable attorney's fees, arising out of the performance of work hereunder by M-1, its agents, employees or subcontractors, excluding any liability caused by the sole negligence or willful misconduct of AP or its partners, officers, agents, representatives or employees. The provisions of this section shall survive any termination or expiration of this Agreement.

b. AP agrees to protect, save, defend, indemnify, and hold harmless M-1, and each of its assigns, agents, representatives, affiliates, subsidiaries, parent entities, officers, directors and employees from and against any and all expenses, damages, claims, suits, actions, judgments, demands, liabilities, debts, damages, and/or costs whatsoever, including attorney's fees, arising out of, and/or in any way connected with, any injury, claim, and/or action arising out of any material breach by AP (including its agents, employees or subcontractors) of this Agreement, and/or AP's (including its agents, employees or subcontractors) gross negligence in performance under this Agreement, excluding any liability caused by the sole negligence or willful misconduct of M-1 or its partners, officers, agents, representatives or employees. The provisions of this section shall survive any termination or expiration of this Agreement.

10. Arbitration / Governing Law. This Agreement has been delivered at and will be deemed to have been made at Los Angeles County, California and will be governed and construed in accordance with the laws of the State of California without regard to any conflicts of laws principles. All parties hereto submit to the exclusive jurisdiction of the federal and state courts sitting in the County of Los Angeles with respect to any dispute resulting from this Agreement. Nothing contained in this Agreement shall be construed so as to require the violation of any law or regulation, and wherever there is any conflict between any provision of this Agreement and any law or regulation, the relevant provision so affected shall be limited only to the extent necessary to permit compliance with the minimum legal requirement, and no other provisions of this Agreement shall be affected. The prevailing party in any dispute arising from the terms of this Agreement shall be entitled to recover its related reasonable attorney fees.

11. Notices. Any notices relating to the contents of this Agreement shall be in writing and shall be deemed effective only if when delivered by hand, sent by facsimile to the number set forth below, mailed by prepaid certified United States mail (return receipt requested) or delivered by overnight courier service, addressed as follows:

AP: Tom Atencio
Affliction Promotions, Inc.
2701 Signal Parkway
Signal Hill, CA 90755

With Copy to: Michael Bassiri
4675 MacArthur Court, Suite 1200
Newport Beach, CA 92660
Tel: (949) 442-7679
Fax: (949) 442-7699

Affliction Promotions
April 8, 2008
Page 5 of 6

      M-1:      M-1 Nederland b.v.
                     c/a Vadim Finkelchtein
                     San Franciscostraat 130-132
                     1175 RE Lijnden
                     The Netherlands

12. **No Waiver.** No failure of any party to give notice of or seek a remedy for any violation of this Agreement or to insist on strict performance hereunder shall reduce, impair or affect such party's right to later seek such remedy or insist on such performance with respect to the same of any other violation or failure, regardless of such party's knowledge or lack of knowledge thereof, nor shall it be deemed a waiver of performance of any duty whatsoever, or of any rights in law or equity.

13. **Disclosure of Information.** Each Party hereto acknowledges that, in and as a result of this Agreement, either one or both Parties may be making use of, acquiring or becoming aware of confidential information of a special and unique nature and value relating to the other Party and its clients, assigns, agents, representatives, affiliates, subsidiaries, parent entities, officers, directors and employees, including but not limited to confidential reports, lists of personal or professional contacts, services rendered by or for either Party and its affiliates, and various monies paid to and by M-1 and M-1. As a material inducement to each Party to enter into this Agreement, each Party covenants and agrees that it shall not, and shall not permit it employees, agents and affiliates, at any time during or following the Term of this Agreement, directly or indirectly, to divulge or disclose, for any purpose whatsoever, any such confidential information which has been obtained by or disclosed by one Party to the other Party as a result of this Agreement, unless compelled to do so pursuant to a court or arbitration mandate, provided the disclosing party has furnished the other with notice and a reasonable opportunity to prevent such disclosure. In the event of a breach or threatened breach by either Party of any of the provisions of this Section 16, the threatened Party, in addition to and not in limitation of any other rights, remedies or damages available to it at law or in equity, shall be entitled to a temporary restraining order and permanent injunction in order to prevent or restrain any such breach by the other Party and/or any and all persons directly or indirectly acting for or with such Party. A violation by either Party of this Section shall be a material violation of this Agreement and shall justify legal and/or equitable relief. Furthermore, each Party agrees that it shall not, at any time, disclose the provisions of this Agreement, including, but not limited to consideration described in Section 4 above, to any third party without the prior written consent of the other Party.

14. **Paragraph Headings.** Paragraph headings are for ease of reference only and are not in any sense to be given weight in the construction of this Agreement. Accordingly, in the event of any dispute as to the construction of this Agreement, it is to be construed as though paragraph headings had been omitted.

15. **Severability.** If any provision of this Agreement or the application thereof shall be invalid or unenforceable to any extent whatsoever, the remainder of this Agreement or the application thereof shall not be affected, and each remaining provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

Affliction Promotions
April 8, 2008
Page 6 of 6

16. <u>Entire Agreement.</u> This Agreement may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute but one and the same instrument. This Agreement constitutes the entire understanding between AP and M-1 and cannot be altered or modified except by an agreement in writing signed by both AP and M-1. Upon its execution, this Agreement shall supersede all prior negotiations, understandings, and agreements, whether oral or written, and such prior agreements shall thereupon be null and void and without further legal effect.

Executed on the day and year written above.

**ACCEPTED AND AGREED:**

**M-1 Nederland b.v.**

By: _Finkelchtein_

Title: _DIRECTOR_

**Affliction Promotions, Inc.**

By: _[signature]_

Title: _Vice President_

CERTIFICATE OF SERVICE

      I hereby certify that on November 6, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

      I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on November 6, 2009.

      s/ MICHAEL BASSIRI
      MICHAEL BASSIRI
      1799 Apollo Court
      Seal Beach, Calfornia 90740
      E-mail: Bassiri@afflictionclothing.com

**Mailing Information for a Case 2:09-cv-07865-MMM-MLG**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michelle L Carder**
  mcarder@hinessmith.com,lpires@hinessmith.com
- **Christine Marie Emanuelson**
  cmclaughlin@hinessmith.com
- **Marc S Hines**
  mhines@hinessmith.com,lpires@hinessmith.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`