Steven A. Silverstein, Bar No. 64610
Mark W. Huston, Bar No. 119872
Robert I. Cohen, Bar No. 168686
SILVERSTEIN & HUSTON
701 South Parker Street, Suite 5500
Orange, California  92868
Tel:   (714) 547-2511
Fax:   (714) 547-0230
Email: silverstein@silversteinhuston.com

Attorneys for Defendant, Affliction Inc. dba Affliction Clothing and
Defendant, Affliction Entertainment Group, LLC, erroneously sued herein as
Affliction Entertainment, LLC

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDOR EMELIANENKO, an individual; M-1 NEDERLAND b.v., a Dutch limited liability company,<br><br>                    Plaintiffs,<br><br>v.<br><br>AFFLICTION INC. dba AFFLICTION CLOTHING, a California business entity, form unknown; AFFLICTION ENTERTAINMENT, LLC, a California limited liability company; and DOES 1 through 50, inclusive,<br><br>                    Defendants. | Case No.: CV09-07865 MMM (MLGx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO M-1 NEDERLAND B.V.'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>DATE:        June 6, 2011<br>TIME:        10:00 a.m.<br>CTRM:       780<br><br>Honorable Margaret M. Morrow<br><br>TRIAL DATE:   August 16, 2011 |

SILVERSTEIN & HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

I.  INTRODUCTION .............................................................................. 2

II.  STANDARD FOR OPPOSING M-1'S SUMMARY JUDGMENT ............ 4

III.  PLAINTIFF'S EVIDENTIARY HURDLES ........................................... 5

    A.  Fact Not Supported by Evidence ........................................... 5

    B.  Consulting vs. Promotion ...................................................... 6

    C.  Beliefs and Understandings .................................................. 6

IV.  A TRIABLE ISSUE EXISTS AS TO THE VALIDITY OF THE "CONSULTING" AGREEMENT ........................................................ 7

    A.  Lack of Consideration for the "Consulting" Agreement ................... 7

        1.  The Fight Agreement Afforded Affliction and Fedor/M-1 to Promote the Fights in the United States and Abroad ............. 8

        2.  Terms (and Lack Thereof) of the Purported Consulting Agreement ................................................................... 10

        3.  M-1's Alleged Performance is Consistent with the Fight Agreement and Wholly Inconsistent with the Consulting Agreement ................................................................... 10

        4.  M-1 Cannot Demonstrate that it Provided any Consulting "Services" for Affliction's Benefit ............................. 11

    B.  The "Consulting Agreement" Was a Sham Transaction .................. 12

        1.  Legal Authority Governing Sham Agreements .................... 12

i

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

2.  Facts and Circumstances that "Consulting Agreement" is a Sham ...................................................................... 13

3.  M-1's Argument regarding Affliction's Claim of Sham Agreement is Unavailing ............................................. 15

C.  M-1 Breached the Terms of the Consulting Agreement .................. 19

V.  THE BREACH OF IMPLIED COVENANT CAUSE OF ACTION IN RELATION TO THE "CONSULTING AGREEMENT" FAILS .............. 19

VI.  THE UNDISPUTED EVIDENCE WILL SHOW THAT M-1 FAILED TO PERFORM THE LETTER AGREEMENT ................................................. 20

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ...... 22**

VII.  THE FIGHT AGREEMENT EXPIRED ON MARCH 31, 2009 .............. 22

VIII.  ANY AGREEMENT FOR A THIRD FIGHT AFTER THE FIGHT AGREEMENT EXPIRED CREATED NEW AND DIFFERENT OBLIGATIONS .................................................................................. 24

IX.  ALTERNATIVELY, THE CANCELLATION BY AFFLICTION OF THE AUGUST 1, 2009 EVENT WAS EXCUSED ........................................... 25

A.  Force Majeure ...................................................................... 25

B.  Impossibility/Impracticability Defense ................................ 27

X.  ISSUES OF REPLACEMENT FIGHTERS, POSTPONING THE AUGUST 1ST FIGHT AND THE UFC ARE RED HERRINGS .............. 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

## TABLE OF AUTHORITIES

**Cases**                                                                            **Page**

*Adickes v. S.W. Kress & Co.,*
    398 U.S. 144 (1970) ........................................................................ 5

*Aldridge v. American Hoechst Corp.,*
    24 F.2d 918, 921 (7th Cir. 1994) ................................................... 5

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242, 252-53 (1986) ......................................................... 4

*Aydin Corp. v. Loral Corp.,*
    718 F.2d 897, 902 (9th Cir. 1983) ................................................. 4

*Bail Bonds by Marvin Nelson, Inc. v. Comm'r of the Internal Revenue Service,*
    820 F.2d 1543, 1548 (1987) ........................................................ 16

*Beatty Safway Scaffold, Inc. v. B.H. Skrable,*
    180 Cal.App.2d 650, 654 (1960) ................................................. 23

*Bosley Medical Group v. Abramson,*
    161 Cal.App.3d 284, 287-88 (1984) ........................................... 16

*Brinson v. Linda Rose Joint Venture,*
    53 F.3d 1044, 1047 (9th Cir. 1995) ............................................... 4

*Careau & Co. v. Security Pacific Business Credit, Inc.,*
    222 Cal.App.3d 1371, 1393 (1990) ............................................ 19

*Christin v. Sup. Ct.,*
    9 Cal.2d 526 (1937) ..................................................................... 25

*Copesky v. Sup. Ct.,*
    229 Cal.App.3d 678, 688 (1991) discussing *Foley v. Interactive Data Corp.,* 47 Cal.3d 654 (1988) ...................................................... 19

*Cutter Laboratories, Inc. v. Twining,*
    221 Cal.App.2d 302 (1963) ......................................................... 25

*Eastman Kodak Co. v. Image Technical Services, Inc.,*

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

504 U.S. 452, 456 (1992) ............................................................5

*Estate of Gaines*,
15 Cal.2d 255, 264 (1940) .......................................................12

*Fairchild v. Park*
(2001) 90 Cal.App.4th 919, 934 (Ortega, J., concurring and dissenting)
citing *Otworth v. Southern Pac. Transportation Co.*, 166 Cal.App.3d 452,
458 (1985) ...........................................................................21

*Fanning v. Schammel*,
68 Cal.428, 429 (1886) ............................................................24

*Fashion Valley Mall, LLC v. County of San Diego*,
176 Cal.App.4th 871, 880-881 (2009) ......................................12

*FPI Development, Inc. v. Nakashima*,
231 Cal.App.3d 367, 401, fn. 18 (1991) ....................................12

*Grant v. Aerodraulics Co.*,
91 Cal.App.2d 68, 75 (1949) .................................................7, 24

*Guz v. Bechtel National, Inc.*,
24 Cal.4th 317, 327 (2000).......................................................20

*Jinro America Inc. v. Secure Investments, Inc.*,
266 F.3d 993, 999-1000 (2001)............................................12, 16

*Kaplan v. Rose*,
49 F.3d 1363, 1369 (9th Cir. 1994).............................................4

*Kennedy v. Reece*,
225 Cal.App.2d 717, 724 (1964)...........................................27, 28

*Lewis & Queen v. N.M. Ball Sons*,
48 Cal.2d 141, 148 (1957)........................................................12

*Mathes v. City of Long Beach*,
121 Cal.App.2d 473, 477 (1953).........................................25, 26

iv

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

*McCalden v. California Library Assn.,*
    955 F.2d 1214, 1219 (9th Cir. 1990)..............................................................28

*Morey v. Vannucci,*
    64 Cal.App.4th 904, 912 (1998)....................................................................23

*Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.,*
    729 F.2d 1530, 1540 (5th Cir. 1984).......................................................26, 27

*Oosten v. Hay Haulers Dairy Employees  & Helpers Union,*
    45 Cal.2d 784, 789-790 (1955) .....................................................................26

*Pacific States Enterprises, Inc. v. City of Coachella,*
    13 Cal.App.4th 1414, 1425 (1993)................................................................19

*Pacific Vegetable Oil Corp. v. C.S.T., Ltd.,*
    29 Cal.2d 228, 238 (1949)...............................................................................5

*Parsons v. Bristol Development Co.,*
    62 Cal.2d 861, 865 (1965)..............................................................................22

*P.A. Smith Co. v. Muller,*
    210 Cal. 219, 222 (1927)................................................................................12

*People v. Meyers,*
    215 Cal. 115, 119 (1932)................................................................................27

*Royer v. Kelly,*
    174 Cal. 70, 72 (1916).....................................................................................7

*Schwartz v. State Farm Fire and Casualty Co.,*
    88 Cal.App.4th 1329 (2001)..........................................................................19

*T.W. Elec. Serv. V. Pacific Elec. Contractors Assn.,*
    809 F.2d 626, 630-631 (9th Cir. 1987) ...........................................................5

*U.S. v. Fontenot,*
    14 F.3d 1364, 1371 (9th Cir. 1994)...............................................................6

*Western Lith. Co. v. Vanomar Producers,*
    185 Cal. 366, 369 (1921)..................................................................................7

v

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

## Statutes

*Federal*

FRCP, Rule 56(c)..................................................................................................5

FRE 802..............................................................................................................6

FRE 803(3)..........................................................................................................6

*State*

Cal. Civ. Code § 1511.........................................................................................26

Cal. Civ. Code § 1550...........................................................................................7

Cal. Civ. Code § 1585.........................................................................................18

Cal. Civ. Code § 1586.........................................................................................18

Cal. Civ. Code § 1605...........................................................................................7

Cal. Civ. Code § 1638...........................................................................................9

Cal. Code Civ. Proc. § 1856................................................................................12

Cal. Com. Code § 2613.......................................................................................26

## Miscellaneous

17A Am. Jur. 2d *Contracts* § 589 (2010)...........................................................24

Rest. 2d, Contracts, Vol. 2, Chap. 11, p. 309, 311, (Introductory Note)..............28

Rest. 2d, Contracts § 237....................................................................................28

Rest. 2d, Contracts § 265....................................................................................28

Rest. 2d, Contracts § 267....................................................................................28

Rest. 2d of Contracts, § 214(d)...........................................................................13

Rest. 2d of Contracts, § 214(d), comment "c"....................................................13

1 Witkin, Summary of Cal. Law 10th, *Contracts* § 924, p. 1021 (2005)...............23

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

# I.  INTRODUCTION

Plaintiffs have spent countless hours taking numerous depositions and propounding repeated written discovery.  The product of much of that effort is contained in the 600+ alleged uncontroverted facts and 400+ exhibits.  However, contained, but not explained, in this massive motion is the simplicity of its opposition.  While the major task to dispute and/or address the claimed facts is complete, what is left is a succinct set of undisputed facts that creates the triable issue at the heart of the "consulting agreement" that existed before this litigation.

The writings and actions of M-1, Affliction, and third parties, as well as the "fight agreement" language itself, establish the "consulting agreement" as a "sham" and as never having possessed any consideration to be binding on anyone.

As succinct and straightforward as is this opposition, so too is Defendants' Motion for Partial Summary Judgment as to the first and second causes of action relating to the "fight agreement."  Defendants thought in the meet and confer discussions that Plaintiff's motion would address this agreement.  Since, Fedor Emelianenko ("Fedor") is not a moving party and has not sought partial summary judgment as to the Fight Agreement, Defendants' affirmative motion is quite different than their opposition to M-1's motion for partial summary judgment.

The "fight agreement" language is straightforward.  The agreement terminated on March 31, 2009 if there was no third fight by that date.  There was no third fight by that date.  It is further uncontroverted, through admissions of Plaintiff, there was no written or oral extension given to extend this agreement prior to March 31, 2009.  Even after March 31, 2009, M-1 admitted the Fight Agreement had expired through the unambiguous language of its own e-mails (discussed in full, *infra*).  A fight was set up for August 1, 2009 between Fedor and Josh Barnett at the Honda Center in Anaheim, California.  That fact is uncontroverted.  The parties also undisputedly continued to negotiate for a new deal.  However, there will be no evidence contemporaneous with that April

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

2

through July, 2009 time period (other than potentially inadmissible declarations of M-1 representatives trying to explain away the clear meaning of their e-mails) that the fight was anything other than an oral agreement to do the event on this date between these opponents, paying Fedor $1,500,000.

Unfortunately for all involved, through no fault of either Fedor or Affliction, that fight could not happen—Josh Barnett tested positive for steroids and was banned from participation. That fact is also uncontroverted. It was thus impossible for either party to perform that fight on that date with those fighters. Affliction's obligations were legally extinguished at that time.

M-1 throws up a smoke screen of issues about replacement fighters and postponements that are of no moment. The uncontroverted facts are there was no agreement to provide a replacement fighter although Affliction reasonably looked into the possibility to see if it could salvage this tragic circumstance. There was also no agreement to postpone the fight and absent such, no obligation to do so.

Under the axiom of "no good deed goes unpunished", Affliction accommodated M-1/Fedor's request to pay Fedor under two agreements, and for the first time since the agreements were executed, M-1 in this litigation is raising and using this accommodation for something it never was, spending hundreds of thousands of dollars in the process. Out of Plaintiff's over **1400 pages** of exhibits and 13 declarations, the agreement between the parties is succinctly stated in 13 lines in M-1's representative's, Vadim Finkelchtein, deposition. He states the offer to co-promote by M-1, Affliction's rejection and the acceptance by M-1 of Affliction's offer to pay Fedor $1,500,000, with M-1 making up the $500,000 difference in their rights to promote these fights in Russia and Asia (*i.e.*, the fight agreement). Declaration of Mark W. Huston ("Huston Decl."), Ex. D, p. 56. Plaintiff's motion for partial summary judgment should be denied and Defendants' motion for partial summary judgment as to the first and second causes of action should be granted.

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

3

For ease of understanding, as explained in the declaration of Michael Bassiri, the company executing the two agreements (Affliction Promotions, Inc.) and its eventual successor company that staged and promoted the fights that occurred (Affliction Entertainment Group, LLC), as well as Affliction Inc. dba Affliction Clothing, will be collectively referred to as Affliction herein.

## II.    STANDARD FOR OPPOSING M-1'S SUMMARY JUDGMENT

A party seeking summary judgment has the burden to identify those parts of the record that indicate the absence of a genuine issue of material fact.  Once the moving party makes this showing, the nonmoving party must designate specific facts showing there is triable fact.  *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1047 (9th Cir. 1995); *Kaplan v. Rose,* 49 F.3d 1363, 1369 (9th Cir. 1994).

The moving party's evidence is judged by the same standard of proof applicable at trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252-53 (1986). "The nonmovant need not match the movant witness for witness, nor persuade the Court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Aldridge v. American Hoechst Corp.,* 24 F.2d 918, 921 (7th Cir. 1994). Summary judgment is inappropriate if there is genuine issue as to any material fact.  FRCP, Rule 56(c).

Summary judgment is a drastic remedy and should be granted with caution: "neither do we suggest that the trial courts should act other than with caution in granting summary judgment…" *Anderson v. Liberty Lobby, Inc., supra,* at 255.

The test of the opposition's evidence is such that the evidence would cause reasonable persons to disagree on whether the facts claimed by the movant are true "enough to require a judge or jury to resolve the parties' differing versions of the truth." *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir. 1983).

The evidence opposing a summary judgment motion is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson v. Liberty Lobby, Inc., supra,* 477 U.S. at 255.  That is, at the summary judgment stage, the

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

4

nonmovant's version of any dispute is presumed correct.  See *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 452, 456 (1992); *T.W. Elec. Serv. V. Pacific Elec. Contractors Assn.,* 809 F.2d 626, 630-631 (9th Cir. 1987).

Perhaps most important to the circumstances of M-1's motion for partial summary judgment, **where the basic facts are not in dispute, if reasonable minds could differ on the inferences to be drawn from those facts, summary judgment should be denied**.  *Adickes v. S.W. Kress & Co.,* 398 U.S. 144 (1970).

### III.   PLAINTIFF'S EVIDENTIARY HURDLES

As set forth in greater detail in Affliction's Statement of Genuine Issues, the vast majority of M-1's alleged uncontroverted facts are insufficient.  As a result, Affliction's objections to such facts must be sustained.  The most glaring problems with M-1's alleged undisputed facts fall into the following categories.

A.   <u>Fact Not Supported by Evidence</u>

The cited evidence does not support many of M-1's alleged uncontroverted fact.  Short of citing each one out of the **600** facts where this deficiency occurred, the following are a few examples of what M-1 did. There are several statements that describe some act M-1 or BEST performed that was done "under the consulting agreement."  Yet the evidence cited does not reference the consulting agreement anywhere.  All M-1 has stated is a legal conclusion.  Such conclusions are left to the memorandum and ultimately are to be made by the trier of fact; not a statement of fact.  After reading M-1's 400+ exhibits, it will not be lost upon this Court that nowhere is the "consulting agreement" discussed post-execution.

Similarly, M-1 repeatedly states that it did some act in relation to the "third fight" and then again cites to an e-mail as support of that statement.  However, nowhere in the cited e-mail is the "third fight" referenced.  It is important to note Affliction is not disputing the e-mails between the parties were sent and/or received.  It is Plaintiff's characterization that is objectionable.  As the Court will see, these examples were the rule, not the exception, in M-1's motion.

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

5

B.   Consulting vs. Promotion

Somewhat overlapping the above problem, M-1 presents a plethora of facts about acts it performed throughout the World.   Based upon the undisputed evidence presented by Affliction and the unambiguous terms of the fight agreement, each and every one of those purported uncontroverted facts is irrelevant.   The reason being, as further demonstrated below, under the "fight agreement," not the "consulting agreement," M-1 had the exclusive rights to "promote" throughout Russia and Asia.   Furthermore, the "fight agreement" provided that any and all revenues derived from Fedor and/or M-1's promotions in Russia and Asia would be retained by Fedor and/or M-1.   Relatedly, according to the "fight agreement," Affliction was to have no responsibility for payment of any expenses in relation to Fedor and/or M-1's promotional exploits throughout Russia and Asia.   This motion is brought on behalf of the "consulting agreement" by M-1, not Fedor under the "fight agreement."   In addition, under the "fight agreement" international "promotion" rights outside of Russia and Asia are held by Affliction, not M-1 or Fedor. The entirety of those facts do not relate to this "consulting agreement" even if it was a valid agreement, which it is not.   Thus, statements of fact listing all of these international activities serves no purpose for M-1's theory that Affliction breached the sham consulting agreement or the letter agreement.

C.   Beliefs and Understandings

M-1 blatantly presents countless alleged statements of fact of M-1's representatives' understandings and beliefs regarding or as a result of the contents of an e-mail.   Why someone did something is not only irrelevant, but hearsay. The state-of-mind exception to the hearsay rule does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind. *U.S. v. Fontenot*, 14 F.3d 1364, 1371 (9th Cir. 1994); FRE 802, 803(3).

Affliction understands why M-1 attempts to set forth beliefs, because the language in the documents it attached between the parties do not support

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

6

Plaintiffs' theories.  As discussed, infra, this Court will readily understand the meaning of the undisputed documents and cited deposition testimony.

## IV.   A TRIABLE ISSUE EXISTS AS TO THE VALIDITY OF THE "CONSULTING" AGREEMENT

Whether it is the lack of any consideration supporting the "consulting agreement" or the undisputed fact that the "consulting agreement" was an afterthought, at the sole request of Fedor and M-1, to ensure Fedor received his well-publicized per-fight purse of $1.5 million without sustaining severe tax implications, there is no question that the "consulting agreement" is a sham.

A.    Lack of Consideration for the "Consulting" Agreement

Every contract must be supported by sufficient consideration.  *Cal. Civ. Code* § 1550.  Consideration is an act or return promise, bargained for and given in exchange for a promise, which either gives a benefit to the promisor or imposes a burden on the promisee. (Cal. Civ. Code § 1605.)

A promise alone, unsupported by consideration, is not enforceable and has no binding force.  *Western Lith. Co. v. Vanomar Producers*, 185 Cal. 366, 369 (1921).  Equally unenforceable is so-called consideration based upon doing or promising to do that which one is already legally bound to do.  *Grant v. Aerodraulics Co.*, 91 Cal.App.2d 68, 75 (1949).

Finally, a party may show the true consideration or want of it by extrinsic evidence for the purpose of avoiding a contract, even though the contract states facts that show a valuable consideration. *Royer v. Kelly*, 174 Cal. 70, 72 (1916).

This latter theory (promise to perform existing duty) is precisely why the "consulting agreement" lacks any consideration and therefore is unenforceable.

1.    *The Fight Agreement Afforded Affliction and Fedor/M-1 to Promote the Fights in the United States and Abroad*

First, under the "fight agreement", not "consulting agreement", Affliction was to be the sole and exclusive **co-promoter**, along with Fedor and his designees

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

7

1  (*e.g.*, M-1) of all mixed martial arts contests in which Fedor participated in the
2  United States.  Plaintiff's COE Ex. 3, ¶ 6 COE # 000039.

3  　　　Second, although Affliction was to retain exclusive worldwide promotional
4  rights, *id.*, those rights were subject to the following:  Fighter and his designees
5  had the exclusive right to promote bouts in the territories of **Russia and Asia**
6  (defined as China, Hong Kong, India, Indonesia, Japan, Malaysia, Philippines,
7  Singapore, South Korea, Taiwan, Thailand). *Id.* at ¶ 11 #000041-42.  Additionally,
8  excluded from Affliction's exclusive rights (in addition to promotions in Russia
9  and Asia) Fedor and his designees had the right to participate in a Fedor v. Randy
10  Couture fight anywhere in the World and had the exclusive rights to promote that
11  fight anywhere in the World. *Id.* at ¶ 6 COE # 000039-40.

12  　　　Third, under the fight agreement, which granted Fedor and his designees
13  (M-1) the exclusive promotional rights in Russia and Asia, Fedor and his assignee
14  (M-1) had to right to exclusively retain any and all revenues derived from their
15  sale, license or other exploitation of those promotional rights in Russia and were
16  also solely responsible for any all costs for the exercise of those rights. *Id.* at ¶ 11
17  COE # 000041-42.   As a result, Affliction had no responsibility for the payment
18  of the exploitation of those promotional rights in Russia and Asia. *Id.*

19  　　　Based upon the express terms of the fight agreement, all of M-1's
20  promotional activities outside of the United States were provided for by way of the
21  fight agreement, not the consulting agreement.

22  　　　2.　　***Terms (and Lack Thereof) of the Purported Consulting Agreement***
23  　　　For the sake of argument only, the terms of the document entitled
24  "consulting agreement" state that M-1 shall provide "general consulting services"
25  to Affliction in connection with the fight agreement in the following areas:  (1)
26  International (excluding U.S.); (2) International (excluding U.S.) Bout Consulting;
27  (3) International (excluding U.S.) television; (4) fighter scouting; (5) location
28  scouting for future bout recommendations; (6) television-related opportunities; (7)

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

International (excluding U.S.) sponsorships; and (8) bout tourism. Plaintiff's COE Ex. 2, COE # 000033.

Also, M-1 was to cooperate and assist in the advertising, publicity and promotion of each bout. In fact, the very language of the consulting agreement states "[i]n addition to the Consulting Services, **and as set forth in the Fight Agreement**, M-1 shall fully cooperate with and assist in the advertising, publicity and promotion of each bout reasonably requested by [Affliction] . . . ." *Id.* at COE # 000034, ¶ 2.b. All this is a verbatim rehash of paragraph 12 of the fight agreement wherein fighter must participate in "advertising, publicity and promotion of each Bout . . . ." *Id.* at COE, Ex. 3 COE # 000042. If M-1 wants to accompany Fedor, that is their business. Affliction is not paying M-1 $1,200,000 to do what the fight agreement says Fedor must do for no additional compensation.

Furthermore, the document entitled "consulting agreement" makes no mention of M-1 being permitted to carry out its "promotions" by entering into contracts with third parties for the benefit of itself. In fact, that interpretation violates California's Civil Code § 1638, which states: "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638. Affliction is going to pay M-1 $1,200,000 for M-1 to promote itself and enter into contracts with third parties to which they got the profit and not Affliction?!? Such an interpretation is contrary to common sense let alone any rational business enterprise. M-1's position is wholly consistent with the terms of the fight agreement, which gave Fedor and his designee (M-1) the exclusive rights to promote in Russia and Asia. M-1's duty to promote said bouts under the "consulting agreement" was already a pre-existing duty under the fight agreement and the consulting agreement was not supported by any "new" consideration.

As for the "consulting" services, they too do not make sense. The "Consulting Agreement" calls for "International (ex US) Bout-Consulting"

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

services; however, for "bouts", under ¶ 6, the "Fight Agreement" states, "contests in which Fighter fights in the United States (the "Bouts and each, a "Bout") . . . ." Plaintiff's COE, Ex. 3, # 000039 ¶ 6.   Why would Affliction pay M-1 for international bouts when the fight agreement calls for "the Bouts" in the U.S.?

As explained below, there is no rational explanation why M-1 would get paid $1,200,000 for its "services" under ¶ 2 of this "consulting" agreement.

At the very least, Affliction has created a triable issue as to the actual, legal and sufficient consideration for the "consulting agreement" to be enforceable.

### 3. *M-1's Alleged Performance is Consistent with the Fight Agreement and Wholly Inconsistent with the Consulting Agreement*

M-1 goes to great lengths to demonstrate its "performance" pursuant to the terms of the alleged "consulting agreement."  However, the very acts performed by M-1 and/or its associates were not mandated by the document entitled "consulting agreement," but rather by the fight agreement.

By examining a few of the examples of M-1's performance summarized in its points and authorities, it is obvious they were based upon the terms of the fight agreement, which granted exclusive rights to Fedor and his designees to promote the fights in Russia and Asia.  First, M-1 allegedly promoted Trilogy by placing billboards throughout Moscow, St. Petersburg, Japan and Korea.  M-1's Fact 187. These four places are within the exclusive promotion rights (Russia and Asia) granted under the Fight Agreement.   Second, Raimond worked with M-1's Japanese promotion contacts to create a publicity blitzkrieg in Japan.  In Fact 195, Plaintiff states through Real Entertainment M-1 promoted Trilogy in Japan. Finkelchtein worked with his Russian contacts in an attempt to televise Trilogy on Russia's state-run television channel.  Mr. Spencer, on behalf of M-1, solicited opportunities in Thailand (fact 171) and Korea (fact 168), television stations in Russia (π's fact 165), contacted Philippine companies (fact 160), contacted Dentsu, Gaora, Hakuhodo, Jsports, TV Tokyo in Japan (fact 151).  This list goes

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

10

on, but all of this undisputedly is Fedor's right to do under the Fight Agreement. Affliction had no right to enter these territories. How then could anyone interpret these acts to be assisting Affliction under the "consulting agreement"?!

All in all, the fight agreement gave Fedor and his designee, namely M-1, the right to partake in the alleged promotion activities they claim to have undertaken in pursuit of the consulting agreement to which they claim resulted in M-1 suffering damages for which they bring this lawsuit for compensation. It makes no sense. The terms of the fight agreement are very clear that Affliction shall have no responsibility for payment of any expenses as a result of the rights reserved specifically for Fedor or his designee (*i.e.*, promotional rights in Russia and Asia).

### 4.   *M-1 Cannot Demonstrate that it Provided any Consulting "Services" for Affliction's Benefit*

Notwithstanding the above, assuming (for argument's sake only) the "consulting agreement" is valid and enforceable; it sets forth "consulting services" to be provided by M-1 to Affliction. In other words, whatever M-1 was to be "consulting" on pursuant to this agreement was to be done for and to the benefit of Affliction. Otherwise, what would be the consideration for paying M-1 $1.2 million in accordance with the compensation terms of the "consulting agreement?" Affliction submits that not only are all the alleged activities performed by M-1 not "consulting" services (instead activities done to promote the fights), but also Affliction received no benefit from such activities.

Plaintiff's Exhibit 258 (COE # 001113) is a contract between M-1 and OJC in which M-1, not Affliction, receives $19,250.00. Plaintiff's Exhibit 259 (COE # 001125-26 [payment terms]) M-1 (licensor), not Affliction, is to receive the fees. Plaintiff's Exhibit 262 (COE # 001169-86) is a contract between Main Event Television in Australia and M-1/BEST for the Affliction Trilogy fight. Paragraph 6 of that contract states Licensee/Main Event Television shall pay Supplier (M-1/BEST), not Affliction. The examples are all the same. M-1 has presented no

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

11

contract that Affliction is to receive the fees.  So how is any such contract, which M-1 alleges is indicative of its performance under the consulting agreement, a service for the benefit of Affliction?

Furthermore, since the only "promotion" rights are pursuant to the fight agreement, all of M-1's performance related to promotion outside of Russia and Asia, was a breach of the fight agreement language by entering into territory that was exclusively under the promotional domain of Affliction, to which only M-1 benefited.  While not the subject of this motion, M-1 has admitted breaching the Fight Agreement. Once again, at a minimum, there are triable issues of fact as to the lack of consideration under the purported agreement.

**B.    The "Consulting Agreement" Was a Sham Transaction**

      1.    *Legal Authority Governing Sham Agreements*

Whether a contract is a sham intended to deceive a third party or whether it is a transaction entered into to create deductible losses or expenses and avoid tax liability, such contracts are invalid and unenforceable. *See, Fashion Valley Mall, LLC v. County of San Diego*, 176 Cal.App.4th 871, 880-881 (2009); *FPI Development, Inc. v. Nakashima*, 231 Cal.App.3d 367, 401, fn. 18 (1991).

Furthermore, California law permits the introduction of parol evidence to prove that a written agreement was actually a cover-up for fraudulent or illegal activity and to establish that such contact had no force, efficacy, or effect. Cal. Code Civ. Proc. § 1856; *Lewis & Queen v. N.M. Ball Sons*, 48 Cal.2d 141, 148 (1957); *P.A. Smith Co. v. Muller*, 210 Cal. 219, 222 (1927); *see also*, *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 999-1000 (2001) ("*Jinro*").   The parol evidence rule is not a rule of evidence, but is one of substantive law, thus California substantive law applies in this instance. *Estate of Gaines*, 15 Cal.2d 255, 264 (1940).

Additionally, the Restatement (Second) of Contracts, which California recognizes and adheres by, provides:  "Agreements and negotiations prior to or

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

12

contemporaneous with the adoption of a writing are admissible in evidence to establish . . . illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause. Rest. 2d of Contracts, § 214(d). Furthermore, comment "c" to section 214 explains the meaning of "other invalidating cause" in the following way: "What appears to be a complete and binding integrated agreement may be a forgery, a joke, a sham, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. They are not affected even by a 'merger' clause, and parol evidence is always to be admitted." *Id.*

### 2.   *Facts and Circumstances that "Consulting Agreement" is a Sham*

Ignoring Plaintiff's after-litigation attempts to explain away the actions of the parties, such actions are numerous in amount and unambiguous in content. There never was a contract for "consulting"; only a mechanism to save Fedor taxes. Examples are as follows:

- The initial contacts were that $1,500,000 was all that Affliction could pay Fedor. Defendants' Statement of Genuine Issues in Opposition, Additional Disputed Facts, Fact No. 1.

- The first 2 drafts, one by M-1, list the $1,500,000 purse fee to Fedor. *Id.* at Fact Nos. 2, 5-6.

- M-1 had a contract to pay Fedor $2,000,000 which M-1 testified was his reasonable purse per fight value, not $300,000. *Id.* at Fact Nos. 3, 20.

- M-1 testified while they requested a co-promotion deal, Affliction refused and "that's why we decided on the offer that Affliction is going to pay for Fedor's participation, one and a half million, and the rest we are going to pay. And we are going to get the rights on our territories and we are going to have money coming from that." *Id.* at Fact No. 4

- M-1, not Affliction, raised the issue of 2 agreements in discussing tax obligations of Fedor. *Id.* at Fact No. 7.

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

- M-1, not Affliction, chose the subjects of "consulting" and $300,000/$1,200,000 split in the document. *Id.* at Fact No. 9.
- M-1 admittedly received the $1,200,000 from Affliction and actually paid that same money to Fedor, by paying some directly to him and some to a company, consistent with Fedor's tax concerns. *Id.* at Fact No. 21.
- No one spoke or wrote about the "consulting agreement" after its execution. *Id.* at Fact No. 10.
- The fight cards stated Fedor's purse was $1,500,000 with no objection from M-1. *Id.* at Fact No. 19.

Perhaps most damaging of all are the e-mails by Raimond and Finkelchtein:

- **5-12-08**: Vadim referencing that they signed Fedor with Affliction (no consulting agreement referenced) and M-1's investment of the $500,000 they pay, obviously their $2,000,000 contract obligation minus the $1,500,000 paid by Affliction. Atencio Decl., ¶ 16 and Ex. A, p. 16.
- **4-10-09**: Raimond references, relating to the date for the next fight, "Is it still within the contract limitations?" Not contract<u>s</u>. COE, Ex. 19 # 000077.
- E-mail from Joost on budget (cost) for Barnett v. Fedor fight. He states Purse-Fedor US$2,000,000 Affliction pays $1.5 million/ M-1 pays $500,000. Atencio Decl., Ex. B, pp. 19-22.
- Raimond e-mail to Binkow at Golden Boy, that M-1 supplements Affliction's Fedor purse with $500,000 (again, $2,000,000 - $1,500,000 of Affliction). *Id.* at Ex. C, p. 23.
  - Binkow does a budget to Affliction and M-1 on a proposed new deal based on all his conversations, including a fight card with Fedor's purse as $1,500,000. Binkow Decl., Ex. A, p. 90.
- **5-11-09**: Raimond email states, "With respect to Fedor and M-1's present <u>agreement</u>, how with the "50/50" partnership affect the present <u>agreement</u>? Presumably, the present <u>agreement</u> would no longer require a $500k +

SILVERSTEIN & HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

14

international marketing investment from M-1 AND Fedor's entire $2 million purse is now paid by the joint venture and international revenue is shared. ..." Plaintiff's COE Ex. 88, #000344. [Underlining added.]

And most damning of all,

- **5-18-09**:   Raimond states, "Affliction's obligations include $1.5MM to Fedor in two agreements."  Atencio Decl., Ex. D, p. 26 (Second Position).

It is no surprise the May 11 and May 18 e-mails are exactly what Finkelchtein testified as what the agreement was. No "consulting" agreement.

The only reasonable inference that can be drawn from this uncontroverted evidence is that it was more advantageous for Fedor to receive less in his per-bout purse and the remainder of what Affliction agreed to pay per bout ($1.5 million) through M-1.  The only way to do that, under the pretense of a "valid agreement supported by consideration", was to enter into the sham "consulting agreement" and provide a vehicle through which M-1 would get paid for doing nothing other than what it had the right to do pursuant to the terms of the Fight Agreement.

At the very least, a genuine issue of fact exists as to the legitimacy of this "agreement" to deny M-1 partial summary judgment.

### 3.   *M-1's Argument regarding Affliction's Claim of Sham Agreement is Unavailing.*

The analysis presented by Plaintiff in its moving papers is misplaced.  First, it makes no difference that Fedor was not listed as a party to the agreement.  That is the sham!  Further, Fedor is also a part owner of M-1.  *Id.* at Ex. C (Deposition of Fedor Emelianenko), p. 49, line 17 to p. 50, line 1.

Second, a contract can be a sham even if it is not done for the sole purpose of tax evasion.  For example, a Korean company (Jinro) entered into a sham agreement with an American company for the purchase of frozen chickens.  This sham agreement operated as a front or cover-up of the real intention of the parties, which was for Jinro to participate in a high-risk investment in the United States

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

15

known as a "roll program", since Korean law strictly regulates the investment of funds originating in Korea in such a roll program.  Jinro advanced $10 million to the American company, who in turn had $10 million of Treasury securities assigned to Jinro as collateral for the advance.  Disappointed by profits from the roll program, Jinro decided to sue the American company to recover its initial $10 million investment, treating the chicken deal as though it were a legitimate agreement.  The defendants argued the chicken deal was designed to cover up a high-risk investment program that circumvented Korea's currency regulations. *See, Jinro, supra*, at 995-999.  Additionally, agreements devised to circumvent state policy, such as agreements seeking to prevent the practice of a business or profession, are also considered sham agreements.  *See, Bosley Medical Group v. Abramson*, 161 Cal.App.3d 284, 287-88 (1984).

Third, even under the law cited by Plaintiff in its moving papers applying to sham agreements for tax purposes, the reasonable inference is that the consulting agreement was a sham.  Namely, a transaction is a sham if it has no purpose or economic effect other than the creation of tax deductions. *Bail Bonds by Marvin Nelson, Inc. v. Commissioner of the Internal Revenue Service*, 820 F.2d 1543, 1548 (1987) ("*Bail Bonds*").  Specifically in *Bail Bonds*, an attorney assisted his clients with tax planning by setting up corporations for his clients (*i.e.*, Bail Bonds by Marvin Nelson) which would enter into agreements with entities created by the attorney (such as Farila and Anglo Dutch).  One such agreement was a reinsurance agreement between Bail Bonds and Farila, whereby Farila took to be secondarily liable for Bail Bonds' losses, but never actually reimbursed Bail Bonds for any forfeitures.   In order to make its premium payments to Farila, Bail Bonds was required to obtain two loans from Anglo Dutch. *Id.* at 1545.

In essence the proceeds of the loans paid by Bail Bonds to Farila where shortly thereafter transferred to Nelson personally.  The tax court characterized the transfer as "part of the pre-arranged transfer of funds designed to produce a

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

16

corporate level deduction for [Bail Bonds] with the monies transferred ending up in the hands of [Nelson]." *Id.*   This ruling was not appealed; whereas, the finding that the nature of the Anglo Dutch loans were a sham was.   However, the Court too held the Anglo Dutch loans were shams finding that "both transactions occurred only on paper and operated simply to circulate money among various participants in the [attorney's] system."   The Court further found that Bail Bonds had not demonstrated that the loans were not shams.

In its determination the Court looked to two factors:  (1) Had the taxpayer shown that it had a business purpose for engaging in the transaction other than tax avoidance? (2) Had the taxpayer shown that the transaction had economic substance beyond the creation of tax benefits? *Id.* at 1549.  "The business purpose factor involves an examination of the subjective factors which motivated a taxpayer to make the transaction at issue.  The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction. *Id.*

Based upon these factors, in light of the facts presented by Affliction, there can be no question that the consulting agreement is a sham.  Given Plaintiff's own testimony, together with the documents and e-mails presented herewith, there simply is no purpose for the consulting agreement other than to maximize Fedor's tax obligations (i.e., tax avoidance).

As for M-1's claim that this first draft of the fight agreement, which included $1.5 million as the purse, when sent contemplated other drafts, it is legally untenable.  That theory fails for a number of reasons.  First, the e-mail attached to the initial draft does not state that.  All it says is, "Here the remarks about Fedors contract", attaching the draft that contained all necessary components to the agreement. COE, Ex. 130.  That is an offer for a contract that can be accepted.  Had Affliction accepted the terms of that first draft agreement

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

17

that would have consummated a contract. Cal. Civ. Code § 1585. Once accepted, M-1 could not have legally come back and said, but wait, we want other terms. Cal. Civ. Code § 1586. Their belief of numerous drafts is irrelevant.

Equally lacking is the economic substance of the consulting agreement. As set forth above, there was no consideration provided by M-1 in exchange for the $1.2 million. Everything that M-1 purports it did under the consulting agreement, as its showing of "economic substance" was a pre-existing duty Fedor and M-1 had under the Fight Agreement. There was nothing new required of M-1 by way of the consulting agreement.

Even the "step transaction" doctrine cited by M-1 and its three "tests" supports a finding that the consulting agreement was a sham based upon the undisputed evidence presented herein. For example, the undisputed evidence shows that M-1 and Fedor took calculated steps to avoid a direct payment of $1.5 million from Affliction to Fedor (as originally drafted) and instead interjected "economically and legally meaningless transactions" between the start and the end to obtain more favorable tax treatment, thus satisfying the "end result test." Next, under the end result test, there can be no dispute given the testimony of M-1's principals that the subjective intent of M-1 was to avoid Fedor getting taxed on $1.5 million individually in the United States. Instead, M-1 (a foreign entity) accepted the majority of the purse for each bout and immediately thereafter paid that to Fedor and his company. Contrary to M-1's argument, the Fight Agreement specifically permitted co-promotion between Affliction and Fedor and his designees (*e.g.*, M-1). Plaintiff's COE Ex. 3, ¶ 6 COE # 000039-40. The type of work allegedly performed by M-1 (promoting and advertising the fights) was further authorized under paragraphs ¶¶ 6, 7, 10 and 11 of the Fight Agreement. Plaintiff's COE Ex. 3, COE # 000039-42.

It does not matter under which of the various tests set forth by M-1 the consulting agreement falls. The evidence presented herein raises more than a

SILVERSTEIN & HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

reasonable inference that the consulting agreement was a mere sham. Therefore, there is a genuine issue of material fact as to the validity of the consulting agreement and for that reason alone M-1's motion must be denied.

C.     M-1 Breached the Terms of the Consulting Agreement.

Assuming again only for argument's sake the agreement is valid, as set forth in the declarations of Tom Atencio and Todd Beard, a substantial triable issue exists that M-1 did not even do the things that were set forth in the agreement.

## V.     THE BREACH OF IMPLIED COVENANT CAUSE OF ACTION IN RELATION TO THE "CONSULTING AGREEMENT" FAILS

If the consulting agreement, as alleged herein above, is invalid and unenforceable for either lacking consideration or being a sham agreement then there can be no covenant of good faith implied in said non-existent contract. *Pacific States Enterprises, Inc. v. City of Coachella*, 13 Cal.App.4th 1414, 1425 (1993). Thus, M-1's fourth cause of action for breach of the implied covenant of good faith and fair dealing must also fail.

Notwithstanding, it is well established in California that a breach of the implied covenant of good faith is a breach of the contract. *Schwartz v. State Farm Fire and Casualty Co.*, 88 Cal.App.4th 1329 (2001); *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal.App.3d 1371, 1393 (1990). Furthermore, "only contract remedies are available for breach of the contractual implied covenant [of good faith and fair dealing]." *Copesky v. Sup. Ct.*, 229 Cal.App.3d 678, 688 (1991) discussing *Foley v. Interactive Data Corp.*, 47 Cal.3d 654 (1988). The only type of business transactions that are amenable to tortious breaches of the implied covenant of good faith and fair dealing are insurance. *Id.* at 689-90.

As a result, "where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is **superfluous**. On the other hand, where an implied covenant claim alleges a breach of obligations beyond the

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

19

1  agreement's actual terms, it is invalid." *Guz v. Bechtel National, Inc.*, 24 Cal.4th

2  317, 327 (2000) (emphasis added).  Plaintiff's motion as to this claim must fail.

3  **VI.     THE UNDISPUTED EVIDENCE WILL SHOW THAT M-1 FAILED**

4  **TO PERFORM THE LETTER AGREEMENT**

5         The letter agreement was an agreement whereby Affliction would sponsor

6  events around the world known as part of the M-1 Challenge.  Pursuant to the

7  agreement, M-1 was to produce a minimum of ten (10) live M-1 Challenge events

8  in 2009.  M-1's COE, Ex. 90 COE # 000397.

9         Accordingly, Affliction was to pay a total of $1 million as sponsorship

10  consideration for the 10 events in exchange for specific benefits.  One such benefit

11  was to identify Affliction as the presenting sponsor of every live M-1 Challenge

12  event by, among other things, identifying the title of the M-1 Challenge for all live

13  events as "M-1 Challenge Presented By Affliction" with the Affliction logo to be

14  included in the title; (2) Affliction name and logo to be incorporated into all M-1

15  Global marketing and advertising activities for the M-1 Challenge whether

16  distributed by web, radio, print, television etc.  Additionally, Affliction was to

17  receive brand recognition and logo placement at all M-1 Challenge live events,

18  including, but not limited to, red and blue corner posts, logo placement at pre and

19  post-bout events, etc.

20         The payment was to be structured through two payments; one payment of

21  $500,000 by January 31, 2009, and a second payment of $500,000 on July 31,

22  2009. Affliction made the first payment, but not the second payment.  At that point

23  in time, M-1 could have treated Affliction's failure to pay as a repudiation and

24  stopped any further performance and potentially any right to further payment.

25  Instead, M-1 elected to obligate itself to carry out its full performance under the

26  letter agreement to attempt to collect on the remaining payment.

27         In doing so, M-1 must demonstrate that it undisputedly performed its

28  obligations under the letter agreement.  That requires M-1 to show that it provided

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

all of the "benefits" set forth in the letter agreement in exchange for its payment of the second installment of $500,000.  Absent M-1's performing the terms of the letter agreement that it was obligated to perform, M-1 is in breach and not entitled to recover its damages.  Under standard contract law principles and the elements of a breach of contract, a party who has breached a contract (without justification or excuse) may not enforce the contract.  *See, Fairchild v. Park* (2001) 90 Cal.App.4th 919, 934 (Ortega, J., concurring and dissenting) citing *Otworth v. Southern Pac. Transportation Co.*, 166 Cal.App.3d 452, 458 (1985).

Here, there is a genuine dispute as to whether M-1 performed its obligations under the letter agreement.  Contrary to the purported uncontroverted facts set forth by M-1, Affliction has presented evidence that many of the benefits set forth in the letter agreement were not done and therefore M-1 is in breach of the letter agreement and not entitled to recover the damages it seeks.  For instance, the agreement required that the title of the M-1 Challenge live event be a certain way.  That did not happen according to the videos submitted by M-1 in support of its motion.  Atencio Decl., ¶ 48.  Nor did Affliction's name and logo appear the way it was required to appear, per the terms of the letter agreement, in and around the ring.  *Id.*  Additionally, most of the contracts that M-1 claims it entered into in relation to the M-1 Challenge events make no mention of Affliction as the sponsor.  Plaintiff's COE, Exs. 98, 100, 101, 103, 105-107, 11, 113, 364, 366-369, 371, 372.  There can be no doubt that an issue exists as to M-1's performance under its obligations pursuant to the letter agreement, which not only raises a genuine issue of material fact that must be tried for purposes of this motion, but relinquishes its right to enforce the contract at all.

Finally, M-1's argument that Affliction has waived its right to assert any defense to the quality of M-1's performance under the letter agreement is misplaced.  The question is not the quality of performance; it is the performance itself.  M-1 was obligated to perform very specific benefits in exchange for the

SILVERSTEIN & HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

monetary compensation by Affliction.  The question is whether M-1 did perform those items.  The evidence unequivocally says it did not.  Next, M-1's reliance on *Frank T. Hickey v. Los Angeles Community* for this position is inapposite.  That case involved a provision of a contract requiring a written change order and the party performed the work without a written change order.  Again, the party in that case was not disputing the work was done; simply that it was done without a change order in writing.  Here, the work was not done as M-1 failed to perform many of the specific benefits required in the letter agreement.

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Unlike M-1's motion, Affliction brings its motion for partial summary judgment upon the only valid and enforceable agreement between the parties relating to the fights in which Fedor was to participate, namely, the fight agreement.  Plaintiffs claim Affliction breached the fight agreement by "failing to complete the third bout under the Fight Agreement and by failing to pay bout fees and travel and accommodation expenses required under the Fight Agreement."  Plaintiff's RFJN, Ex. 2, p. 19, lines 19-21.

As set forth herein, together with the undisputed evidence, Affliction is entitled to judgment as a matter of law as to Plaintiffs' first cause of action for breach of the fight agreement.

## VII.   THE FIGHT AGREEMENT EXPIRED ON MARCH 31, 2009

The interpretation of a contract is a question of law.  *Parsons v. Bristol Development Co.*, 62 Cal.2d 861, 865 (1965).  Contract interpretation "is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect."  *Id.*   In interpreting a contract, the court considers the language of the contract, the circumstances under which the parties negotiated or entered into the

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

22

contract, the object, nature and subject matter of the contract, and the subsequent conduct of the parties. *Morey v. Vannucci*, 64 Cal.App.4th 904, 912 (1998).

Here, the Fight Agreement unambiguously states that the term of the agreement ends the **earlier** of March 31, 2009 or the "conclusion of the **last bout** . . . in **which Fighter [Fedor] is obligated to participate** which is a **minimum of three (3) Bouts** . . . ." Plaintiff's COE, Ex. 3 COE # 000039 (emphasis added).

It is a general rule of contract law that "when a contract specifies the period of its duration, it **terminates on the expiration of such period**. *Beatty Safway Scaffold, Inc. v. B.H. Skrable*, 180 Cal.App.2d 650, 654 (1960) (emphasis added). In other words, the obligations of a contract are discharged by expiration of the term of the agreement. 1 Witkin, Summary of Cal. Law 10[th], *Contracts* § 924, p. 1021 (2005).

It cannot be disputed that a third bout did not happen by March 31, 2009. It is also undisputed that there had been no extensions of the fight agreement prior to March 31, 2009. Bassiri Decl., ¶ 11; Huston Decl., ¶ 6 and Ex. E (Raimond Depo.), p. 73, lines 2-23. Thus, on March 31, 2009 the fight agreement expired on its own terms and all obligations thereunder were discharged.

In fact, Plaintiffs acknowledged that the fight agreement had expired when Raimond acknowledged the negotiating window had either expired or was about to expire in requesting an "offer" by Affliction to extend "Fedor beyond the third fight" on June 22, 2009. This request for an offer is in relation to paragraph 18 of the fight agreement, which does not extend any obligation, or even take effect until after the fight agreement **has expired,** by its very terms. Bassiri Decl., Ex. D, p. 42; Plaintiff's COE, Ex. 3, COE # 000044, ¶18. Plaintiff can have no explanation why such a letter was sent if they did not already know the contract was expired. Steve Bash, M-1's counsel, sent an e-mail on May 4, 2009 referencing the contract expiration of March 31, 2009. Plaintiff's COE, Ex. 144, # 0000782. Finally, Mr. Raimond sends an e-mail on May 18, 2009 stating a deal

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

23

has to be agreed upon or "we [M-1] do not believe we can do the event." *Id.* at Ex. 22, COE # 000083.  If the fight agreement was extended, as Plaintiffs claim, why would a new deal need to get done before Fedor can do the August 1 event?!  Based on M-1's own admissions, what Affliction has been saying all along is now uncontroverted.  The Fight Agreement was not extended and terminated on its own terms on March 31, 2009.

## VIII. ANY AGREEMENT FOR A THIRD FIGHT AFTER THE FIGHT AGREEMENT EXPIRED CREATED NEW AND DIFFERENT OBLIGATIONS

Plaintiffs will undoubtedly argue that Defendant's conduct subsequent to March 31, 2009 acted as an "extension" of the agreement and/or estoppel to raise the expiration of the contracts as of March 31, 2009.  However, this argument fails both legally and factually.

Once a contract expires, it cannot be revived.  *See, Fanning v. Schammel,* 68 Cal.428, 429 (1886).  Also, where, after the expiration of a contract fixing the reciprocal rights and obligations of the parties, the parties continue to do business together, the conduct of the parties may at times permit, or even require, a finding that they impliedly agree that their rights and obligations in connection with such business should continue to be measured as provided in the old contract; but even in such case, the reciprocal obligations arise from the new implied contract, and unless an intent to make such a new contract is expressed or may be fairly inferred from the conduct of the parties, the obligations of the parties are not measured by the terms of the expired contract.  17A Am. Jur. 2d *Contracts* § 589 (2010).

"Termination" of a contract means "to abrogate so much of it as remains unperformed, thereby doing away with the existing agreement upon the terms and with the consequences agreed upon." *Grant v. Aerodraulics Co., supra,* at 75.

The only evidence Plaintiff claims supports an extension is the language of the May 13, 2009 letter drafted by M-1's lawyer and executed by Mr. Atencio to

1   obtain a visa for Fedor for the August 1, 2009 event.  While the language may
2   state an extension is given, the law does not recognize it as such.

3   Thus, all that happened subsequent to March 31, 2009 is simple.  M-1,
4   Fedor and Affliction tried to do a new deal going forward.  It could not be done for
5   various reasons that are irrelevant to this issue.  They simply agreed to another
6   event, on a given date (Aug. 1, 2009), between Fedor and Josh Barnett and pay
7   Fedor as he had been paid before.  Any other conclusion is contrary to the e-mail
8   transmissions and reasonable inferences therefrom and the law.

9   **IX.   ALTERNATIVELY, THE CANCELLATION BY AFFLICTION OF**
10  **THE AUGUST 1, 2009 EVENT WAS EXCUSED**

11  California law recognizes a number of defenses to the non-performance of
12  a contract.  In other words, there are principles of law that, if met, will excuse a
13  party for breaching a contract.  Prevention of performance by a party (Cal. Civ.
14  Code § 1511), impossibility or impracticability (*Christin v. Sup. Ct.*, 9 Cal.2d 526
15  (1937)), frustration of purpose (*Cutter Laboratories, Inc. v. Twining*, 221
16  Cal.App.2d 302 (1963)), and force majeure (*Mathes v. City of Long Beach*, 121
17  Cal.App.2d 473, 477 (1953)), just to name a few.

18  Assuming for argument's sake, that under some theory Affliction had an
19  obligation to provide a third fight, no matter when the date, Affliction's
20  cancellation of the bout scheduled for August 1, 2009, based on the Barnett
21  steroid ban, was excused.

22  A.   Force Majeure

23  The common law force majeure defense is similar to the defense of
24  impossibility due to an Act of God or an irresistible, superhuman cause that
25  excuses a party's non-performance of obligation.  *See* Cal. Civ. Code § 1511.  The
26  one distinction is that force majeure does not exclude the idea of human agency.
27  *Mathes v. City of Long Beach*, 121 Cal.App.2d 473, 477 (1953).  Thus, " 'the test
28  for force majeure is whether under the particular circumstances there was such an

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

25

insuperable interference occurring without the party's intervention as could not have been prevented by the exercise of prudence, diligence and care.' " *Id.* quoting *Pacific Vegetable Oil Corp. v. C.S.T., Ltd.*, 29 Cal.2d 228, 238 (1949).

By comparison then, the want of performance of a legal duty arising from tort or contract, in whole or in part, or any delay therein, is excused when it is prevented or delayed by an irresistible, superhuman cause, and/or force majeure, unless the parties have expressly agreed to the contrary. *See* Cal. Civ. Code § 1511; *see also* Cal. Com. Code § 2613.

Under California law it must be demonstrated that the excusing event was **beyond the reasonable control** of either party. See *Oosten v. Hay Haulers Dairy Employees & Helpers Union*, 45 Cal.2d 784, 789-790 (1955).   The term "reasonable control" encompasses two factors.   First, a party may not affirmatively cause the event that prevents his performance and second a party may not rely on an excusing event if the party could have taken reasonable steps to prevent it. *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 729 F.2d 1530, 1540 (5th Cir. 1984) [applying California law].

Here, there is no question both facts are present. It is undisputed that Josh Barnett tested positive for steroid use and as a result he was denied a license by the California Athletic Commission to participate in the August 1, 2009 fight with Fedor.   Notice of such was received by Affliction on July 21, 2009. Atencio Decl., ¶ 36.

It is also undisputed that Josh Barnett testing positive for steroid use and, as a result, being disqualified by the California Athletic Commission from participating in the August 1, 2010 bout was something that was beyond the reasonable control of Affliction or Plaintiffs.   Affliction did not cause Josh Barnett to test positive for steroid use nor could it have done anything to prevent it from happening. *Id.*   Plaintiffs admittedly have no knowledge that Affliction caused Josh Barnett to test positive for steroids and his subsequent

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

disqualification.  Huston Decl., Ex. C (Fedor Depo.), p. 51, line 23 to p. 52, line 9; Ex. E (Joost Raimond Depo.) p. 79, lines 10-25.   Nor will Plaintiffs be able to present any evidence of such in opposition.  Such a claim would be absurd.

Furthermore, this was not an instance where the excusing event could have been prevented by the payment of money or some other action by the breaching party.  *See e.g., Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc., supra*, at 1543.  Affliction could have done nothing to prevent Josh Barnett from ingesting or injecting steroids, short of hiring a person to be with him 24 hours a day, 7 days a week, obviously not a legal nor reasonable obligation.

Plaintiffs can also not escape these facts by saying Mr. Atencio knew of Barnett's prior steroid use.  They agreed to Barnett and his prior one-time steroid issue was public knowledge.  He fought subsequent to that occurrence.

Accordingly, Affliction's decision to cancel the August 1, 2009 was wholly justified under the doctrine of force majeure.  Affliction is therefore entitled to judgment as a matter of law as it has a complete defense to Plaintiffs' breach of contract cause of action as to the fight agreement.

B.     Impossibility/Impracticability Defense

The facts and circumstances that transpired as a result of Josh Barnett testing positive for steroid use and him being denied a license to participate in the August 1 bout with Fedor resemble a textbook case study of the impossibility/impracticability defense.

At common law, the determination that a contract was impossible to perform was limited to literal or physical impossibility.  *Kennedy v. Reece*, 225 Cal.App.2d 717, 724 (1964).  However, modern cases recognize something as legally impossible when it is impracticable, that is, when it can be done only at an excessive and unreasonable cost.  *People v. Meyers*, 215 Cal. 115, 119 (1932); *Christin v. Sup. Ct.*, 9 Cal.2d 526, 533 (1937).  The defense of impracticability is

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

based upon facts that make performance more difficult or expensive than the parties anticipated. *Kennedy v. Reece, supra*, at 725.

The effect of the impracticability doctrine is to relieve the obligor of his or her duty because the contract, having been made on a different "basic assumption," is regarded as not covering the case. Rest. 2d, Contracts, Vol. 2, Chap. 11, p. 311 (Introductory Note).

Even where the obligor has not limited his obligation by agreement, the court may grant relief because "an extraordinary circumstance may make performance so vitally different from what was reasonably to be expected as to alter the essential nature of that performance." *Id.* at p. 309.

There are three distinct grounds for discharging the obligor's duty. First, the obligor may claim that some circumstance has made his own performance impracticable. *Id.* at p. 309. Second, the obligor may claim that some circumstance has so destroyed the value to him of the other party's performance as to frustrate his own purpose in making the contract. Rest. 2d, Contracts § 265. Third, the obligor may claim that he will not receive the agreed exchange for his own performance because some circumstance has discharged the obligee's duty on the ground of either impracticability or frustration. *Id.* at §§ 237, 267.

A party invoking impossibility/impracticability must show that reasonable efforts were used to surmount the obstacles that prevented performance. *McCalden v. California Library Assn.*, 955 F.2d 1214, 1219 (9th Cir. 1990).

Initially, there is and was nothing that could be done to allow Barnett to fight on August 1, 2009. He was the agreed-upon fighter and he could not fight. Further, no one could know when or if he would ever be reinstated. In fact, it is almost two years after the disqualification and he still cannot fight in California. At that moment, it was impossible to have the fight that was agreed upon to go forward on August 1, 2009. Affliction undisputedly was excused from any obligation to Plaintiffs in relation to that very specific fight.

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

Much has been made about canceling versus postponing the fight. Defendant submits that issue is irrelevant for two reasons.

First, the agreement was not to simply have another fight, it was to have this particular fight (Fedor v. Barnett) and this very particular fight could not happen.

Second, Defendant was undisputedly getting out of the fight promotion business after August 1, 2009. Ignoring the fact the Fight Agreement had expired, in the light most favorable for M-1, there was somehow an extension of the fight agreement until August 1, 2009. When a fight could not happen by that date, the contract, even under Plaintiffs' interpretation, expired by its own terms. Can they reasonably argue there had to be an indefinite postponement? Of course not.

Likewise, without even any discussion of any agreement for a replacement fighter, M-1 cannot place upon Affliction an obligation to accept someone else no matter the cost, the fighter's condition, or the timing of the replacement. That is the purpose behind the impracticability defense, not to force such a circumstance.

It is undisputed, Golden Boy opined the fight should not proceed on August 1, 2009 and that the only possible opponent, Brett Rogers, was not a viable substitute. Showtime, the Pay-Per-View provider, strongly suggested the fight not happen on August 1, 2009. The hurdle of advertising is also undisputed. The drop in revenue for a replacement at this late date, as well as additional costs, is not disputed. Whether that cost was $800,000 or some other figure is irrelevant. It is present. There is no requirement under the law that would force such an obligation to replace the fighter at whatever costs upon a contracting party.

## X.   ISSUES OF REPLACEMENT FIGHTERS, POSTPONING THE AUGUST 1ST FIGHT AND THE UFC ARE RED HERRINGS

It is anticipated, by way of Plaintiff's motion, that Plaintiffs will raise one or more of the following issues in hopes of creating a triable issue. However, these "alleged" issues are not material in any way and only referenced to draw the Court's attention to very clear facts the contract was expired.

SILVERSTEIN & HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

First, upon the expiration of the fight agreement on March 31, 2009, Affliction's obligations to perform any act pursuant to that agreement were extinguished with the exception of paragraph 18, as were those of Plaintiffs (M-1 and Fedor). However, this paragraph simply allowed Affliction to attempt to keep Fedor under the Exclusivity rights of paragraph 7. The remedy if no new agreement is reached is simply that Fedor can enter into a new contract with third parties. Pursuant to the post-March 31, 2009 agreement of a fight on August 1, 2009 between Fedor and Barnett, there was no provision or even discussions that if the agreed to and contemplated fighters could not participate that either party was obligated to provide a replacement fighter. Whether such a term was included in a prior agreement is of no moment, as that agreement is no longer in effect.

Second, as with the replacement fighter issue, there was further no requirement nor even discussion to extend past August 1, 2009 to stage this fight if something unexpected occurred. In other words, there was nothing mandating a postponement of the fight set for August 1, 2009. M-1's claim that during negotiations with UFC in early July, 2009, before Barnett's disqualification occurred, Affliction discussed postponing the August 1, 2009 is misconstrued. Affliction proposed that the **UFC take over** the Trilogy event scheduled for August 1, 2009 and postpone it to September 19, 2009; not that Affliction was agreeing with Fedor or M-1 to continue staging the fight and postponing it to September. Fedor was not a party to this offer, which was rejected immediately by the UFC. Thus, Plaintiffs misinterpret their own evidence. Furthermore, Affliction had made a business decision that it was exiting the MMA event promotion business after the August 1, 2009 fight between Fedor and Barnett. M-1's e-mail of July 14, 2009 even confirms M-1 was informed of this. Plaintiff's COE, Ex. 67. Affliction simply had no obligation to postpone the event. Why then did they attempt to find a replacement fighter? That too is obvious. Affliction had expended a great amount of money into this event. From a business

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

30

standpoint they needed to explore the possibility, if it existed, of how to lose the least amount of money. A loss was already assured. The option with the least loss was cancellation. Since there was no contract that prevented this decision, it was the only intelligent business decision.

Plaintiffs make a monumental issue out of Affliction's business decision to cancel as relating to some conspiracy with the UFC that arose after the steroid issue arose. That theory has simply not produced any factual support because it did not happen. Affliction began negotiations with the UFC about entering into a clothing sponsorship deal with UFC – the main promoter of MMA events. Aside from the irrelevance any agreement Affliction entered into with the UFC has as to the validity and/or enforcement of the sham consulting agreement and/or the fight agreement, Affliction began these negotiations and decided to enter into this agreement with the UFC **weeks before** the news of Barnett testing positive for steroids arose. Bassiri Decl., ¶¶ 15-16 and Ex. E, p. 43.

Furthermore, Plaintiffs claim of "hurrying" up with the UFC so that the deal could be struck before Fedor landed in the U.S. so that the obligation to pay pursuant to the sham consulting agreement is simply absurd. Unfortunately, that is all Plaintiffs have as there is no legal or factual basis for their claims.

Plaintiffs took the deposition of the UFC representatives and that did not produce any evidence to this theory. The evidence, pre-steroid notification, is that Affliction would only exit the business after the August 1, 2009 event. As the evidence submitted by both sides clearly proves the proximity of the transaction relates only to the fact the negotiations admittedly started within 2 weeks of the August 1, 2009 event. That does not create the unreasonable inference that UFC and Affliction knew Barnett would test positive for steroids in early July and thus concocted a scenario to cancel an event that had already cost Affliction substantial money, just to get out of an event they promoted. It does not make sense because it is not true.

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

Dated: March 28, 2011

SILVERSTEIN & HUSTON

By: _____
Steven A. Silverstein
Mark W. Huston
Robert I. Cohen
Attorneys for Defendant Affliction Inc. dba Affliction Clothing and Defendant, Affliction Entertainment Group, LLC, erroneously sued herein as Affliction Entertainment, LLC

SILVERSTEIN
& HUSTON
701 S. Parker St.
Suite 5500
Orange, CA
92868
(714) 547-2511

32